Erin Rose Ronstadt, SBN 028362
Kyle Shelton, SBN 027379
RONSTADT LAW, PLLC
P.O. Box 34145
Phoenix, AZ 85067
(602) 615-0050
(602) 761-4443 Fax
erin@ronstadtlaw.com
kyle@ronstadtlaw.com
*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Megan Hooker, an unmarried person, | **Case No.** |
| Plaintiff, | |
| v. | **COMPLAINT** |
| Hartford Life and Accident Insurance Company, a foreign insurer, | (Jury Trial Demanded) |
| Defendant. | |

For her claims against Defendant Hartford Life and Accident Insurance Company ("Hartford" or "Defendant"), Plaintiff Megan Hooker ("Ms. Hooker" or "Plaintiff") alleges as follows:

**PARTIES, VENUE, AND JURISDICTION**

1. Ms. Hooker is an unmarried individual residing in Coconino County, Arizona. She is a resident of Arizona within the District of Arizona. Ms. Hooker is a citizen of the United States of America.

2. Ms. Hooker was an employee of American Whitewater ("AW").

3. AW purchased Policy Number 398687 (the "LTD Policy" or the "Policy") from Hartford to provide long-term disability ("LTD") insurance benefits to certain employees, including Plaintiff. [*See* Exhibit 1].

4. The Policy is exempt from the Employee Retirement Income Security Act of 1974 ("ERISA").

5. Hartford states that the Policy is not subject to ERISA in its internal notes.

6. Plaintiff's claims against Hartford are subject to Arizona law.

7. Hartford is an insurance company licensed and authorized to do business in Arizona.

8. Hartford has intentionally availed itself of the benefits and protections of the laws of the State of Arizona.

9. Hartford operates insurance sales offices in Arizona, including but not limited to the sale of LTD policies.

10. In exchange for premiums, Hartford provides LTD benefits and administers claims under the Policy.

11. Ms. Hooker was injured because of Hartford's breach of contract and bad faith refusal to approve LTD benefits under the Policy.

12. Ms. Hooker's damages and the amount in dispute exceed $75,000.

13. Jurisdiction and venue are proper in the United States District Court for the District of Arizona.

14. Plaintiff demands a jury trial on all triable issues.

## GENERAL ALLEGATIONS

### *The Policy Benefits*

15. All previous and succeeding paragraphs and headings are incorporated by reference.

16. Under the LTD Policy, "Disability means that during the Elimination Period and the following 24 months, Injury or Sickness causes physical or mental impairment to such a degree of severity that You are: 1) continuously unable to perform the Material and Substantial Duties of Your Regular Occupation; and 2) not Gainfully Employed."

17. Under the Policy, "[a]fter the LTD Monthly Benefit has been payable for 24 months, Disability means that Injury or Sickness causes physical or mental impairment to such a degree of severity that You are: 1) continuously unable to engage in any occupation for which You are or become qualified by education, training or experience; and 2) not Gainfully Employed."

18. The Elimination Period under the Policy is 90 days for LTD claims.

19. Under the Policy, "Material and Substantial Duties means the necessary functions of Your Regular Occupation which cannot be reasonably omitted or altered."

20. Under the Policy, "Regular Occupation means the occupation that You are performing for income or wages on Your Date of Disability. It is not limited to the specific position You held with Your Participating Employer."

21. The LTD Policy does not define 'any occupation.'

22. Under the LTD Policy, an insured who meets the definition of Disability is entitled to receive LTD benefits until Social Security Normal Retirement Age or until no longer Disabled.

23. Plaintiff's Social Security Normal Retirement Age is 67.

### Ms. Hooker's Employment and LTD Claim

24. AW hired Plaintiff on or about February 7, 2011.

25. Plaintiff worked as an Associate Stewardship Director for AW.

26. On or about April 23, 2018, Plaintiff became unable to continue in her regular occupation due to Disability and left work.

27. Ms. Hookers suffers from Myalgic Encephalomyelitis ("ME")/Chronic Fatigue Syndrome ("CFS")/ Systemic Exertion Intolerance Disease ("SEID"); Postural Orthostatic Tachycardia Syndrome ("POTS"); Mast Cell Activation Syndrome ("MCAS"); Post-Concussive Syndrome ("PCS"); Small Intestinal Bacterial Overgrowth ("SIBO"); Endometriosis; Joint Hypermobility Syndrome; Complex Regional Pain Syndrome ("CRPS") of the right ankle; Tethered Cord Syndrome; and probable Craniocervical Instability ("CCI") and Cerebrospinal Fluid ("CSF") Leak.

28. Ms. Hooker is disabled due to her collective medical conditions.

29. On or about May 29, 2018, Plaintiff submitted to Hartford a claim for short-term disability ("STD") benefits.

30. Hartford approved Plaintiff's STD claim and paid STD benefits through the maximum period payable.

31. On or about July 24, 2018, Plaintiff submitted LTD proof of loss to Hartford.

32. In an October 24, 2018 letter, Hartford denied Plaintiff's LTD claim.

33. In July 2019, through counsel, Plaintiff appealed Hartford's denial, providing ample, additional evidence of her Disability under the Policy.

34. On August 20, 2019, Hartford Appeal Specialist, Dennis Birchland, provided Plaintiff's counsel with three medical consultant reports and demanded a response within 21 days.

35. On September 5, 2019, Plaintiff, through counsel, explained Plaintiff would require additional time to respond to the reports, explaining: "We will require an additional 45 days, to October 24, 2019. Hartford's final review period will be tolled until the date the documents are received by Hartford."

36. On September 24, 2019, Hartford acknowledged the 45 days Plaintiff would need to respond: "[W]e will wait until the 45 day tolling period you previously requested to expire to allow ample time to respond before we continue our review. In accordance with our claims procedures and in order to provide you with a full and fair review of your claim, our time to make a final decision would normally be tolled for 21 days, but per your 9/5/19 request as confirmed in our 9/12/19 letter to you, we will toll for your requested 45 days. Please send your responses to our office when available."

37. Plaintiff's counsel never received the purported September 12, 2019 letter from Hartford.

38. Plaintiff's counsel's September 5, 2019 letter expressly and unambiguously stated she would require an additional 45 days, or until October 24, 2019, to respond to the consultant reviews.

39. On October 24, 2019, Plaintiff's counsel submitted by fax to Hartford responses to the consultant reviews, which consisted of over 1,000 pages.

40. Hartford refused to consider Plaintiff's responses to its reviews, asserting inaccurately that the evidence was sent too late, after business hours, and that compliance with ERISA otherwise precluded its consideration of the additional submitted evidence.

41. Had ERISA applied to the claim, Hartford would have been required to consider the additional evidence due to its fiduciary obligations to Plaintiff, which mandate that Hartford act in Ms. Hooker's best interests.

42. Even in the absence of ERISA's regulatory scheme, Hartford was required to consider additional evidence submitted in support of the claim.

43. Hartford upheld its denial of the claim in a letter dated October 24, 2019 (the "Final Denial").

44. In its Final Denial, Hartford provided Ms. Hooker until October 24, 2022 to file a lawsuit.

45. The Final Denial explained that Hartford's claim decision "is now final" and Ms. Hooker's only remaining remedy was to file a lawsuit.

46. Before the Final Denial, Hartford plainly encouraged Ms. Hooker to continue in the claims process by appealing, giving Plaintiff hope that Hartford might approve the claim following her appeal.

47. Hartford also permitted Ms. Hooker to submit responses to medical consultant reports, which also provided hope that Hartford might approve the claim.

48. The Final Denial was the first time Hartford unequivocally communicated to Ms. Hooker that no LTD benefits would be paid on the claim.

49. Hartford misrepresented ERISA's application throughout the claim, thereby inducing Ms. Hooker and her attorney into appealing and responding to Hartford's reviewer reports.

50. Hartford knowingly misrepresented Ms. Hooker's claims as governed by ERISA; the claim file demonstrates Hartford knew at the claim's outset it was exempt from ERISA.

-5-

51. The Final Denial is adversarial in that it reserves all rights and defenses available to Hartford in making its decision.

52. Plaintiff is informed and believes that Hartford failed to provide its complete internal notes to Plaintiff, and continues to withhold relevant documents, in part because it knows it has misrepresented ERISA as the applicable law.

53. Hartford improperly and dishonestly used ERISA as a shield to avoid payment of the claim and to sidestep the review of over 1,000 pages of supportive documents, which would have justified approving the claim.

54. Plaintiff continues to meet the definition of Disability as set forth in the LTD Policy.

55. Plaintiff continues to be unable to perform the Material and Substantial Duties of her Regular Occupation or any occupation based on her reasonable training, education, and experience.

56. On June 16, 2020, Plaintiff received a fully favorable Social Security decision after a hearing with an Administrative Law Judge based on objective evidence of her debilitating, physical conditions.

57. In order to receive Social Security Disability Insurance, Ms. Hooker met a definition of disability much more stringent than that of the Policy.

58. Plaintiff's conditions have only persisted since Hartford's Final Denial.

59. Ms. Hooker cannot work on a full-time or part-time basis.

60. Plaintiff exhausted all administrative remedies before bringing this lawsuit.

**COUNT I**
**(Breach of Contract)**

61. All previous and succeeding paragraphs and headings are incorporated by reference.

62. Hartford entered into a valid and binding contract with AW to provide LTD benefits to Plaintiff until she was no longer disabled or until her maximum benefit period under the terms of the Policy.

63. Ms. Hooker was insured under the LTD Policy.

64. Ms. Hooker reasonably expected that she met the requirements of Disability as defined by the LTD Policy, and that she would receive LTD benefits under the Policy until she was no longer Disabled or until age 67.

65. Despite Ms. Hooker's Disability coverage, Hartford improperly denied her LTD benefits in breach of its contractual obligations.

66. Hartford's claims handling and decision to deny benefits was designed to Hartford's financial benefit and to Ms. Hooker's financial detriment.

67. Hartford's decision to deny benefits was not supported by substantial evidence.

68. Hartford denied Ms. Hooker's LTD benefits with the knowledge that it had no reasonable basis for doing so, and the so-called "independent" medical consultant reviewers Hartford enlisted are routinely retained by Hartford (or a third-party at Hartford's behest) in disability claims to manufacture evidence favoring the denial of disability benefits.

69. Hartford never had Ms. Hooker evaluated in person.

70. Plaintiff meets the 'any occupation' definition of Disability according to her treating providers and the collective medical evidence.

71. The assessments of Plaintiff's treating providers are supported by the objective medical evidence.

72. The fully favorable Social Security determination is further objective evidence of Plaintiff's entitlement to LTD benefits.

73. Hartford improperly ignored evidence and denied Plaintiff's LTD claim in breach of the Policy.

74. The medical evidence in Hartford's possession unequivocally supported Plaintiff's ongoing eligibility for LTD benefits.

75. Despite its obligation under the Policy, Hartford failed to consider all the evidence in support of Plaintiff's inability to work in her regular occupation or any occupation, which constitutes a breach of contract.

76. Hartford ignored the opinions of Plaintiff's treating providers and relied on a lack of information and the opinion of biased consultants to deny benefits.

77. Hartford failed to pay Ms. Hooker her LTD benefits despite being obligated to do so under the Policy.

78. Plaintiff remains totally Disabled under the LTD Policy and is entitled to LTD benefits.

79. Plaintiff has been financially damaged as a direct result of Hartford's failure to pay LTD benefits under the Policy.

80. Hartford's failure to pay benefits was not based on the existence of a genuine dispute, is not fairly debatable, and its claims decision lacked a reasonable basis.

81. Hartford's denial constitutes anticipatory repudiation of the contract and, therefore, Ms. Hooker is entitled to current receipt and acceleration of all LTD benefits.

**COUNT II**
**(Breach of the Duty of Good Faith and Fair Dealing)**

82. All previous and succeeding paragraphs and headings are incorporated by reference.

83. Hartford breached the duty of good faith and fair dealing by unreasonably denying Ms. Hooker's LTD benefits claim in direct contradiction of the medical evidence.

84. Hartford acted unreasonably in evaluating Ms. Hooker's claim, and it intentionally denied her benefits without a reasonable basis and without adequate investigation.

85. Hartford's claims handling was designed and implemented to find ways to reduce or avoid its liability.

86. As an institution, Hartford has a pattern and practice of denying claims at the outset of a claim. In doing so, Hartford routinely employs reviewers or consultants it statistically knows will support claims terminations, secures employability assessments based on nothing but those biased reviews, and denies claims without speaking with treating providers, including without giving insureds a chance to facilitate treating providers'

responses, or any responses for that matter. Hartford followed this pattern in Ms. Hooker's claim and has executed this same pattern in numerous other claims.

87. Hartford put its own interests ahead of Ms. Hooker's interests and acted directly against Ms. Hooker's interests for its own gain.

88. Hartford administered Ms. Hooker's claim with the intent to frustrate Ms. Hooker's ability to obtain benefits by failing to properly communicate with Ms. Hooker and her treating physicians and imposing arbitrary and unreasonable requirements, which it concealed from Ms. Hooker, such as the date it would refuse to consider additional evidence from her attorney.

89. Basing a decision to deny benefits on a purported technical failure to respond is an act of bad faith.

90. Hartford's reliance on biased reviews constitutes bad faith.

91. Hartford frequently hires the consultant reviewers used in Ms. Hooker's claim to generate evidence supporting the denial or termination of LTD claims.

92. When an insurer uses the same doctors on an ongoing basis, the doctors become biased because they lose their independence. *See Hangarter v. Provident Life and Accident Ins. Co.*, 373 F.3d 998, 1010-11 (9th Cir. 2004).

93. Hartford's use of biased reviewers, consultants, and vendors is evidence of institutional bad faith and part of a pattern and practice.

94. Hartford's failure to timely and promptly pay the claim caused Ms. Hooker significant financial harm.

95. Hartford administered Ms. Hooker's claim with the intent to deny benefits, which is evidenced in part by claim "segments."

96. As an institution, Hartford uses "segments" to set claims on paths which include predetermined processes to achieve certain outcomes.

97. At the outset of a claim, a team lead or manager will perform an "initial triage recommendation." The outcome of the triage recommendation is assigning the claim to a "segment."

-9-

98. Hartford assigns a claim to "segment 1" if it deems the claim has low medical or occupational complexity or anticipates the insured will return to work.

99. Hartford assigns a claim to "segment 2" if it deems the insured will return to their own or an alternate occupation.

100. Hartford assigns a claim to "segment 3" if it deems the claim has occupational or financial complexities and the outcome is uncertain.

101. Hartford employs its "Triage Assumptions" software or tool, which takes into consideration age, gender, salary, job type, spousal information, diagnosis complexity, occupational complexity, and benefit amount, among other considerations, to make recommendations and predictions about claims.

102. For instance, Hartford's triaging tool predicts "expected test change recovery rates" and recovery outlooks.

103. As a result of Hartford's triaging tool, comments and recommendations are made at a claim's outset to assist claims managers with navigating the "test change" and, as Plaintiff is informed and believes, providing tips for managing the claim down the road.

104. Plaintiff is informed and believes Hartford's segmentation practices inform what resources to use on a claim, and that Hartford maintains statistical information on the likelihood that use of those resources will result in a denial of benefits.

105. On information and belief, Hartford's "segments" are internal claims guidelines used by Hartford to manage claims based on Hartford's anticipated financial liability as part of its Claims Excellence program.

106. On information and belief, Ms. Hooker's claim is "segment 3."

107. On information and belief, most denied claims are "segment 3."

108. In Ms. Hooker's claim, Hartford concluded: "Tool recommended segment is Segment 3. Key factors in recommendation are: Diagnosis Complexity: High; Recovery Outlook: Uncertain; Occupational Complexity: Moderate; Final segment is: Segment 3."

109. At Hartford's institutional direction, Hartford's employee, Katherine Mcdonough, conducted the initial triage recommendation in Ms. Hooker's claim.

-10-

110. As a result of its segmentation recommendation, Hartford determined that Ms. Hooker had a "[h]igh likelihood [to be] qualified to perform any occupation depending on education and experience," and that the "Expected Test Change recovery rate: 26%-36%" would apply.

111. Hartford tracks and measures employee performance for "redirection" rates; referrals to the Special Investigations Unit; quality scores based on medical management and losses to the Hartford; and Audits and Claims Quality Index ("CQI") scores – to name just a few areas of measured employee performance.

112. Hartford claims adjusters participate in the Annual Incentive Plan ("AIP") and have bonus targets tied to corporate profitability.

113. Hartford claims that "Hartford . . . has policies and procedures in place to insulate the claims and appeals processes from any financial interest. Claims and appeals administrators are segregated from the financial department and do not have access to its financial information. The compensation of claims and appeals adjudicators has no relation to denial or termination rates."

114. Hartford's statements disclaiming financial conflict of interest are untruthful and intentionally misleading to insureds.

115. In truth, Hartford does tie claims department compensation to the denial or termination of claims, albeit in more creative and sometimes indirect ways, such as through soft-dollar variance reporting on "overpaid" claims and CQI scores, just to name a few examples.

116. Hartford touts its contracts with third-party vendors to engage experts to perform peer reviews of medical evidence and independent medical examinations rather than utilizing Hartford employees as a protection for insureds.

117. In truth, Hartford hires third-party vendors it knows are likely to provide biased reports to support the denial of claims.

118. Hartford's use of biased third-party vendors is a critical part of its institutional bad faith segmentation practices.

119. In avoiding approval of Ms. Hooker's claim and pre-determining the high likelihood of a "test change" denial, Hartford avoided setting aside significant reserves on Ms. Hooker's claim, which helps its profitability as a company.

120. Ms. Hooker is informed and believes that Hartford never properly set aside adequate reserves to fund her LTD claim under the Policy.

121. Ms. Hooker is informed and believes Hartford institutionally does not intend to pay otherwise valid claims; instead, it limits its liability by either denying claims or settling claims for less than owed.

122. As part of its bad faith conduct, Hartford misrepresents its ability to disclose statistical data about its claims handling.

123. As an institution, Hartford recklessly misrepresents claims as subject to ERISA so as to avoid financial liability, including exposure to punitive damages, and to trick insureds into participating in the appeals process.

124. Hartford has claimed ERISA applies when it clearly does not in several instances, including in claims made under its former contract with the Arizona Department of Administration.

125. Here, Hartford fraudulently induced Ms. Hooker and her attorney into believing ERISA applied to the claim. In so doing, Hartford forced Ms. Hooker and her attorney through unnecessary hurdles and justified denial of the claim based on ERISA regulations.

126. Even still, Hartford acted in its own best interests and misrepresented ERISA's regulatory framework in denying the claim and in refusing to consider additional evidence.

127. On information and belief, the internal medical reviewers, outside medical consultants, Hartford's employees, and vocational examiners were financially or otherwise incentivized to deny Ms. Hooker's claim.

128. Hartford's conduct was motivated by financial considerations and caused by its conflicted role as both decision maker and payer of Ms. Hooker's LTD benefits.

Hartford has failed to produce any evidence that it protected Ms. Hooker from its conflict and instead intentionally withheld information that would have otherwise revealed the depth of its self-interested conduct. Although the claim is exempt from ERISA, this is also bad faith.

129. As an institution, Hartford uses claim payment reduction goals and cost containment measures as a method of profit-making for the company. In so doing, Hartford unfairly and arbitrarily reduces or denies payments on legitimate claims in an across-the-board fashion to attain its numerical reduction goals. Hartford's cost containment measures are consistent with and a part of a corporate-wide plan and scheme.

130. On information and belief, emails are sent to claims department employees at Hartford setting forth the profitability of Hartford as a whole and separately for the benefit of departments for the preceding quarter.

131. Hartford employees understand that their bonuses are based on Hartford's profitability.

132. "[E]ven if Hartford does not explicitly tie administrators" remuneration to denial or termination of claims, its employees are acutely aware that Hartford evaluates them on that basis. *Hertz v. Hartford Life and Acc. Ins. Co.,* 991 F. Supp. 2d 1121, 1135 (D. Nev. 2014).

133. On information and belief, all Hartford employees have access to benefit amounts and computations.

134. On information and belief, Hartford engaged in undocumented "huddles," or claims meetings, and employs an internal instant messaging system that permits claims personnel to communicate about claims, but it does not include the messages in the claim file and does not produce the messages as part of the claim file.

135. Hartford placed its financial interests ahead of Ms. Hooker's interests, failing to act with the decency and humanity required by the duty of good faith and fair dealing.

136. Hartford either intended to injure Ms. Hooker or acted to serve its own interests, having reason to know and consciously disregarding a substantial risk that its conduct might significantly harm Ms. Hooker.

137. Clear and convincing evidence exists that Hartford acted with an evil mind, engaging in aggravated and outrageous conduct.

138. Hartford willfully decided to act against Ms. Hooker by denying LTD benefits.

139. Hartford's segmentation practices are outrageous, willful, and designed with an evil mind to drive Hartford's profitability.

140. Hartford's improved "loss ratio" over the years since enacting its Claims Excellence program and segmentation practices demonstrate its bad faith use of claims to drive corporate profitability.

141. Hartford's conduct towards Ms. Hooker was willful, oppressive, malicious, deceptive, and was in conscious disregard of her rights, with the intent to harm or injure her, such that there should be an assessment of punitive damages against Hartford in an amount appropriate to punish and deter it.

142. Hartford's handling of Ms. Hooker's claim was inconsiderate, rude, oppressive, outrageous, and in total disregard for her safety, welfare, and well-being.

143. As a result of Hartford's wrongful conduct, Ms. Hooker has suffered pecuniary damages under the LTD Policy, including but not limited to past-due and future LTD benefits, other damages to be shown at trial, and attorneys' fees and costs.

144. As a proximate result of Hartford's conduct, Ms. Hooker has also suffered and will continue to suffer pain, anxiety, worry, humiliation, and physical and emotional distress, all to her general damage in an amount to be shown at trial.

145. Ms. Hooker relied on coverage under the LTD Policy, believing the promises Hartford made as to the security such coverage would afford her.

146. Ms. Hooker relied on Hartford's promise of coverage to her extreme detriment.

147. Hartford's conduct has denied Ms. Hooker the security and peace of mind she thought she possessed as a result of being insured.

148. Defendant engaged in improper acts specifically knowing that Plaintiff was financially and emotionally vulnerable, and consciously disregarding a substantial risk of significant harm to Plaintiff.

149. Through outrageous conduct motivated by improper financial interests, Hartford abandoned the clear terms of the LTD Policy to find Ms. Hooker was not Disabled.

150. Hartford has intentionally engaged in insult and personal abuse of Plaintiff by accusing her of exaggerating and overstating her physical symptoms and complaints, and by suggesting that Plaintiff has falsely claimed that she is entitled to Policy benefits.

151. Hartford mischaracterized the evidence to place Ms. Hooker in a negative light. It did so without requisite training or education and in bad faith with the purpose of trivializing and/or undermining the seriousness of Ms. Hooker's conditions.

152. As a proximate result of Hartford's conduct, Ms. Hooker has also suffered and will continue to suffer pain, anxiety, worry, humiliation, and physical and emotional distress, all to her general damage in an amount to be shown at trial.

153. For Hartford's breach of its duty of good faith and fair dealing, Ms. Hooker is entitled to future benefits under the LTD Policy.

154. Hartford's bad faith is part of an institutional scheme, entitling Ms. Hooker to significant punitive damages, which is necessary to deter Hartford's evil conduct in the future.

155. Ms. Hooker is entitled to recover attorney's fees pursuant to A.R.S. § 12-341.01.

**WHEREFORE**, Ms. Hooker respectfully requests that the Court award:

A. An award of all past-due benefits in an amount to be determined according to proof inclusive of interest thereon as provided by law and by the Policy;

B. An award of future damages based on the value of benefits that would be received throughout Plaintiff's life pursuant to contract as damages for Hartford's tortious breach of the obligation of good faith and fair dealing, all as previously set forth herein;

C. An award of past, present, and future damages for physical suffering, emotional distress, humiliation, inconvenience and anxiety as a result of Hartford's tortious breach of the obligation of good faith and fair dealing, as previously set forth herein;

D. An award of punitive damages sufficient to punish Defendant and to deter them and similarly situated defendants from engaging in similar conduct in the future, commensurate with the reprehensibility of Defendant's conduct as provided by law; and

E. Such other relief as may be provided by law.

Dated this 16th day of September 2021

                              RONSTADT LAW, PLLC

                              By: *s/Erin Ronstadt*
                                  Erin Ronstadt
                                  Kyle Shelton
                                  Attorneys for Plaintiff

**RONSTADT LAW, PLLC**
P.O. Box 34145, Phoenix, AZ 85067
6122 N. 7th St., Suite B, Phoenix, AZ 85014
(602) 615-0050